IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ERIC REGINALD THORNTON, #275-106 | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-16-2452 |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | * | |
| DR. JEFFERY WOLF | * | |
| WEXFORD HEALTH SOURCES, INC. | | |
| JOHN W. ASHWORTH, Interim Pres./CEO | * | |
| DANIEL I. CONN, CEO/Pres. | | |
| | * | |
| Defendants | | |

\*\*\*

## MEMORANDUM OPINION

Eric Reginald Thornton, a Maryland Division of Correction ("DOC") prisoner housed at Jessup Correctional Institution ("JCI"), filed a self-represented civil rights complaint under 42 U.S.C. § 1983, seeking money damages against Wexford Health Sources, Inc. ("Wexford") and two of its officers, as well as the University of Maryland Medical System ("UMMS") and one of its employees, Dr. Jeffery Wolf. (ECF No. 1). Thornton alleged that Wolf negligently performed surgery on his nose in 2008, and that Wexford, the DOC's contractual health care provider, has delayed treatment to correct the problem caused by the surgery. (*Id.*). Defendants Wexford, UMMS, and Wolf were dismissed by order dated July 5, 2016, and the case proceeded for service of process on Defendants Ashworth and Conn, solely as a civil rights action alleging a failure to provide adequate and appropriate medical care in violation of the Eighth Amendment. (ECF No. 3).

Defendant Conn,[1] Wexford's CEO, responded to the court's service order, and has filed a motion to dismiss or in the alternative motion for summary judgment, as supplemented. (ECF No. 7). The motion is unopposed.[2] The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, Defendant's motion, construed as a motion for summary judgment, shall be granted.

**Background**

Thornton seeks ten million dollars pursuant to the civil rights act, 42 U.S.C. § 1983. (ECF No. 1 at p. 5). He alleges that he suffered damage to his nasal septum due to medical negligence during a surgery at an area hospital in November of 2008. (*Id.* at p. 3). Thornton complains that following that surgery, "Wexford took more than 6 years to send [him] back for a follow up with a E.N.T. [ear, nose and throat] specialist" and when he saw the specialist on May 26, 2015, Thornton "had a large perforation (hole) in my septum." (*Id.* at pp. 4, 5). Thornton complains that the specialist suggested surgery to close the perforation and the use of Vaseline in the area, but a "year has past [sic] and [he] was issued only one modest tube of Vaseline." (*Id.* at p. 5). Thornton states he has lost his sense of smell and taste, has chronic dryness and difficulty breathing, and has developed a bleeding ulcer.[3] (*Id.*).

---

[1] Service of process has not occurred on Defendant Ashworth, who is named as an interim CEO of medical contractor Wexford. The complaint does not specify any basis for naming Ashworth, and does not describe how Ashworth violated Thornton's civil rights. Given these deficiencies in pleading, had Ashworth been served with the complaint, he also would be entitled to summary judgment.

[2] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Clerk of Court on September 22, 2016 informed Thornton that Defendant had filed a dispositive motion; that Thornton had seventeen days in which to file written opposition to the motion; and that if Thornton failed to respond, summary judgment could be entered against him without further notice. (ECF No. 9). Thornton has chosen not to respond.

[3] The medical record does not reveal that Thornton complained of an ulcer problem. He does take a fiber supplement for chronic constipation. (ECF No. 8 at pp. 17, 22).

2

Defendant, who is not a medical care provider, provides a different version of the care provided to Thornton, who suffers from sarcoidosis,[4] hernia, asthma, and septal perforation. On May 26, 2015, Thornton was seen by Anwar Mumtaz, M.D. at Bon Secours Hospital. (ECF No. 8 at p. 1). Dr. Mumtaz notes that Thornton had nose surgery twice, once for the septum and then for sinuses, and has a history of prescription and over-the-counter use of nasal spray. (*Id*.). Thornton reported frequent nose bleeds and difficulty breathing through the nose, and indicated his middle turbinates previously had been removed. (*Id*.). A large septal perforation was noted. (*Id*.). Thornton was told to use saline gel or Vaseline to keep the area moist, and informed that if he wanted surgery, it could be performed by a specialist at a tertiary care facility.[5] He was advised that the success rate for septal closure was limited. (*Id.*).

On June 2, 2015, Thornton requested to view his medical records. (*Id.* at p. 2). On June 8, 2015, he was seen by Emmanuel Esianor, P.A. subsequent to his return from Bon Secours Hospital for treatment of a recurrent nose bleed. (*Id.* at p. 3). Thornton reported all had gone well, and the doctor had confirmed what he knew about septal perforation. Vaseline was ordered. (*Id.* at p. 4).

On July 17, 2015, Thornton submitted a sick call request for dental assistance. (*Id.* at p. 5). On December 16, 2015, he was seen at the chronic care clinic for sarcoidosis, where he denied any complaints and was deemed asymptomatic. (*Id.* at pp. 6-7). Examination of

---

[4] Sarcoidosis, an inflammatory disease, can affect almost any organ in the body. The classic feature of sarcoidosis is the formation of granulomas, microscopic clumps of inflammatory cells that group together. When too many of these clumps form in an organ they can interfere with how that organ functions. Sarcoidosis most commonly targets the lungs and lymph nodes, but the disease can and usually does affect others organs, too, including (but not limited to) the skin, eyes, liver, salivary glands, sinuses, kidneys, heart, the muscles and bones, and the brain and nervous system. *See* https://www.stopsarcoidosis.org/awareness/what-is-sarcoidosis. Sarcoidosis is increasingly suspect in nasal septal perforation. *See* http://www.ncbi.nhn.nih.gov/pubmed/1248139.

[5] Tertiary care is specialized consultative care on referral by specialists working in a center that has personnel and facilities for such treatment. See http://www.hopkinsmedicine.org/patient_care/pay_bill/insurance_footnotes.httnl.

Thornton's nose, mouth and throat showed no nasal deformity, and his mucous membranes were normal. (*Id.*). A non-formulary request for Vaseline was submitted, and approved. (*Id.* at pp. 8-9).

On February 17, 2016, Thornton submitted a sick call request regarding headaches caused by sinus infections. (*Id.* at p. 10). On February 26, 2016, he was seen by Joan Bailey, R.N., then referred to a mid-level provider for treatment. (*Id.* at p. 11).

On March 2, 2016, Thornton was seen by Getachew Tefferra, M.D. at the chronic care clinic. (*Id.* at pp. 12-13). He had no respiratory symptoms. (*Id.*). Thornton's Vaseline prescription was renewed to July 2, 2016 (*id.*), and was approved March 8, 2016. (*Id.* at pp. 14-15).

On March 8, 2016, Thornton was seen by Emmanuel Esianor, P.A. at a provider sick call, where he complained of a sinus infection and was prescribed one week of 500 mg Amoxicillin. (*Id.* at pp. 16-17).

On or about April 9, 2016, Thornton complained of daily nose bleeds. (*Id.* at p. 18). He was seen on April 23, 2016, by Oladipo Olaleye, R.N.P., and complained of chronic sinus problems, nose bleeding, and difficulty breathing with some nose pain. (*Id.* at pp. 19-20). Thornton was diagnosed with nasal congestion, but showed no sign of epistaxis (nose bleeds). He was prescribed saline nose spray (*id.*), and a consult was placed to evaluate closure of the septal perforation. (*Id.* at p. 21).

On May 28, 2016, Thornton was seen by Darryl Hill, M.D. at the chronic care clinic, where he denied any pulmonary symptoms, but was noted to have a history of sinus involvement. Prescriptions for Afrin, saline nasal sprays, and Vaseline were renewed. (*Id.* at pp. 22-25).

On June 28, 2016, Thornton submitted a sick call request complaining that infected cuts and bumps were not healing fast enough. (*Id.* at p. 26). Two days later, on June 30, 2016, he filed his complaint in this court.

### Standard of Review

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF No. 12. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the

district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, *supra*, 637 F.3d at 448-49. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62

(D. Md. Feb. 14, 2011)).  "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate."  *Harrods,* 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.*  (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).  Plaintiff has not filed an affidavit under Rule 56(d) or filed any correspondence or motion with the court following submission of the complaint.  In light of the foregoing, the court is satisfied that it is appropriate to address Defendant's motion as one for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Because Plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

**Discussion**

1. <u>Defendant Conn's Liability</u>

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no

8

*respondeat superior* liability under §1983). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001), citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Thornton does not allege Defendant Conn was in any manner personally involved in providing him medical care. (ECF No. 1; ECF No. 7-4, Affidavit of Kasahun Temesgen, M.D. at p. 2, ¶ 5). Conn is not a medical provider, does not provide medical care to inmates at JCI, and had no involvement in the clinical decisions of the prison health care providers who treated and evaluated Thornton. (*Id*.). Nothing in the record contradicts these determinations, and Conn is entitled to summary judgment. That determination, however, does not end this court's evaluation of Thornton's underlying claim of denial of medical care in violation of the Eighth Amendment

    2. <u>Liability of Unnamed Health Care Providers Under the Eighth Amendment</u>

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment, *see Gregg v. Georgia*, 428 U.S. 153, 173

(1976), and "[s]crutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003), citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant or the failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in

light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (Actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge). In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier*, 896 F.2d at 851. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U. S. 825, 837 (1994). Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). Mere negligence or malpractice does not rise to a constitutional level. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). Further, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely desirable." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977).

11

The record evidence indicates that Thornton's need for treatment is ongoing and has been addressed appropriately by prison medical personnel. The fact that elective surgery – which carries risk and a low success rate – may be required does not reflect deliberate indifference. Thornton has failed to establish a violation of his Eighth Amendment right based on the medical care provided him. A separate Order shall be entered granting Defendant Conn's summary judgment motion and closing this case.

  November 2, 2016                                     _____/s/_____
                                                                        DEBORAH K. CHASANOW
                                                                        United States District Judge